## RECORD NO. 15-1403

In The

# United States Court Of Appeals
## For The Fourth Circuit

**JEFFREY C. SKEENS, as Administrator of the Estate of Grover Skeens;**
**CAROLYN D. DAVIS, as Administratrix of the Estate of Charles T. Davis;**
**OWEN T. DAVIS, as Administrator of the Estate of Cory Davis,**

*Plaintiffs – Appellants,*

v.

**ALPHA NATURAL RESOURCES, INC.;**
**ALPHA APPALACHIA HOLDINGS, INC., f/k/a Massey Energy Company,**

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

———————

## BRIEF OF APPELLANTS

———————

**J. Michael Ranson**
RANSON LAW OFFICES, PLLC
**1562 Kanawha Boulevard, East**
**P.O. Box 3589**
**Charleston, WV 25336**
**(304) 345-1990**

**G. Patrick Jacobs**
JACOBS LAW OFFICE
**7020 MacCorkle Avenue, SE**
**Charleston, WV 25304**
**(304) 926-6676**

*Counsel for Appellants*

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.     Does party/amicus have any parent corporations?                    YES     NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                    YES     NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      YES      NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      YES      NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?      YES      NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************
I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____            _____
(signature)                                    (date)

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................... iii

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION .............................................................................1

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE...............................................................................2

    Statement of the Facts ...................................................................5

SUMMARY OF THE ARGUMENT ...................................................................10

    a.    Estate Beneficiaries ...........................................................11

    b.    Wrongful Death Beneficiaries............................................13

    c.    Distribution Differences between Monies Paid to Estate
        Beneficiaries and Monies Paid to Wrongful Death
        Beneficiaries ......................................................................14

ARGUMENT ......................................................................................................15

    Standard of Review.....................................................................15

    Discussion of the Issues..............................................................16

        District Court's Memorandum Opinion and Order Dated
        May 13, 2013...................................................................16

            a.    The Court erred in not reviewing this matter
                under the Crime Victims' Rights Act.............................16

District Court's Memorandum Opinion and Order Dated April 6, 2015 ...................................................................25

a. Standing and Prosecutorial Discretion and the NPA ......................................................................25

b. Who are 'victims' and 'families' as the words are used in the NPA? .....................................................28

c. The NPA requires payment as opposed to a waiver of payment ...........................................................30

CONCLUSION ...........................................................................46

REQUEST FOR ARGUMENT ....................................................47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

PAGE(S)

**CASES:**

███████████████
████████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████████

*Does v. United States*,
      817 F. Supp. 2d 1337 (S.D. Fla. 2011)...............................................21, 22, 24

*E. Steel Constructors, Inc. v. City of Salem*,
      549 S.E. 2d 266 (W. Va. 2001) ....................................................................35

████████████████████████████████████████████████
████████████████████████████████████████████████████████

*Hartmann v. Windsor Hotel Co.*,
      132 W. Va. 307, 52 S.E.2d 48 (1949) ...........................................................37

*Hatfield v. Health Management Associates of West Virginia*,
      223 W. Va. 259, 672 S.E.2d 395 (2008) .......................................................37

*In re W.R. Huff Asset Management Co.*,
      409 F.3d 555 (2nd Cir. 2005) .......................................................................22

*Kenna v. U.S. Dist. Court for C.D. Cal.*,
      435 F.3d 1011 (9th Cir. 2006) ......................................................................16

*Murphy v. Eastern American Energy Corp.*,
      224 W. Va. 95, 680 S.E.2d 110 (2009) .........................................................13

*Mylan Labs., Inc. v. Matkari*,
      7 F.3d 1130 (4th Cir. 1993) ..........................................................................15

*Robinson v. Cabell Huntington Hosp., Inc.*,
      498 S.E.2d 27 (W. Va. 1997) ........................................................................35

*Shearer v. United Carbon Co.*,
    143 W. Va. 482, 103 S.E.2d 883 (1958) ........................................................37

*Standard Oil Company v. Smith*,
    116 W. Va. 16, 178 S.E. 281 (W. Va. 1935) ...................................................36

*State ex rel. Trent v. Sims*,
    77 S.E.2d 122, 138 W. Va. 244 (W. Va. 1953) ...............................................31

*United States v. McHan*,
    101 F.3d 1027 (4th Cir. 1996) .......................................................................35

*United States v. McVeigh*,
    106 F.3d 325 (10th Cir. 1997) .......................................................................16

*Woodford v. Glenville State College Housing Corp.*,
    159 W. Va. 442, 225 S.E.2d 671 (W. Va. 1976) ............................................36

**Statutes:**

18 U.S.C. § 3663 ..................................................................................................29

18 U.S.C. § 3663(a)(1)(A) ....................................................................12, 29, 45

18 U.S.C. § 3771 .........................................................................................*passim*

18 U.S.C. § 3771(a) ........................................................................................16, 24

18 U.S.C. § 3771(a)(2) ........................................................................................21

18 U.S.C. § 3771(a)(3) ........................................................................................21

18 U.S.C. § 3771(a)(6) ..........................................................................................1

18 U.S.C. § 3771(b) ............................................................................................22

18 U.S.C. § 3771(d)(1) ........................................................................................16

18 U.S.C. § 3771(d)(3) ........................................................................................17

18 U.S.C. § 3771(e) ............................................................................12

W. Va. Code § 42-1 ................................................................9, 11, 12

W. Va. Code § 42-1-3a ....................................................................11

W. Va. Code § 55-7-6 ..................................................................*passim*

W. Va. Code § 55-8-12 ......................................................................35

**Rules:**

Fed. R. Civ. P. 12(b)(6) ....................................................................15

Fed. R. Civ. P. 12(d) ........................................................................51

**Other Authorities:**

*4 11 Williston on Contracts*
       § 30:6 (4th ed.) ....................................................................27, 39

Anson, *Principles of the Law of Contract* 149
       (Arthur L. Corbin ed., 3d Am. ed. 1919) ....................................38

Campbell, *et al. Crime Victims' Rights Act*,
       Pub. L. No. 108-405, §§ 101-104, 118 Stat. 2260 (2004) ............16

Black's Dictionary 9th Edition ........................................................38

Murray, *Cases and Materials on Contracts*
       427 (2d ed. 1976) ..................................................................38

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The underlying causes of action were initiated in the Southern District of West Virginia by the estate beneficiaries of three (3) Fallen Miners. The three actions were filed as a federal question under the Crime Victims' Rights Act 18 U.S.C. § 3771 and pursuant to diversity jurisdiction as a contract action to enforce the terms of a Non-Prosecution Agreement to which the Appellants were third party beneficiaries. Appellate jurisdiction is based upon the district court's dismissal of the plaintiffs' causes of action. The district court determined it did not have jurisdiction to preside over these matters. (JA 40)  Appellate jurisdiction is also based upon the district court's dismissal of the plaintiffs' diversity causes of action holding that the Appellants failed to state of cause of action upon which relief could be granted (JA 488).

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in dismissing the plaintiffs' causes of action filed pursuant to 18 U.S.C. § 3771 Crime Victims' Rights concluding that they did not have a pre-indictment right to be "treated with fairness and with respect" (JA 40)?

2.  Whether the district court erred in dismissing the plaintiffs' causes of action wherein the plaintiffs sought review of a voluntary restitution agreement to assure the restitution was paid in full and timely pursuant to 18 U.S.C. § 3771(a)(6) (JA 40)?

3.  █████████████████████████████████████████████████████████████

4.  █████████████████████████████████████████████████████████████

## STATEMENT OF THE CASE

Appellants are Estate Beneficiaries of three of the Fallen Miners who died at Upper Big Branch on April 5, 2010 when a mine owned by Massey Energy Company (hereinafter "Massey") exploded. The blast killed 29 miners died and seriously injured countless others.

In the aftermath of the explosion, the United States Attorney for the Southern District of West Virginia began a criminal investigation.   Massey was a primary target of the investigation. The first indictments were returned in Superseding Indictments in *United States v. Hughie Elbert Stover,* 5:11 Cr. 00038 (S.D. W. Va.) and in *United States v. Thomas Harrah*, 5:11 Cr. 00082 (S.D. W. Va.).

On June 1, 2011, Alpha Natural Resources, Inc. (hereinafter Alpha) purchased the assets of Massey and its affiliated companies[1]. Alpha, as a new buyer of Massey and its affiliates was concerned that the Massey entities would be charged with criminal acts and ordered to pay restitution. In an effort to alleviate this concern, Alpha entered into a Non-Prosecution Agreement (NPA) with the United States Attorney in which it voluntarily agreed to pay $1,500,000.00 in restitution to each of the families of the Fallen Miners and to 2 of the injured miners (JA 78). The NPA was dated December 6, 2011. To date, Alpha has paid the voluntary restitution to

---

[1] It is undisputed that Alpha's purchase permitted it to assume indirect ownership of all Massey subsidiaries and that the assets or liabilities of those entities purchased were not transferred. Also, it is undisputed that Alpha is not a successor to Massey.

2

only 20 of the 29 families. Alpha has failed and refused to pay restitution to the remaining 9 families including these Appellants[2].

It is not disputed that the intent of the NPA was to treat each family of each miner the same. The NPA requires each family to be paid $1,500,000.00 in restitution. In order to determine whether all families were treated fairly under the NPA or received the voluntary and agreed upon restitution the Court must define "family". Once "family" is defined the question is simple: "Have the 'families' been paid the agreed upon restitution?" If, and in the event some families have not been paid the agreed upon restitution, then the question becomes "does the district court have authority to order payment of the agreed upon restitution?"

The Appellants contend that "family", as defined by West Virginia law, is none other than the Estate Beneficiaries of each of the deceased miners. Simply put, these Appellants, all of whom are estate beneficiaries of deceased miners, have not been paid the agreed upon restitution, although all other Estate Beneficiaries of deceased miners have been paid. Alpha inexplicably proclaims that it is not required

---

[2] The NPA divides the 29 fallen miner's families into two groups, i.e. the *Fallen 11* and the *Fallen 18*. However, it is believed that 2 of the *Fallen 11* received amounts equal to the agreed upon restitution above the $3,000,000.00 settlement. If true, this reduces the *Fallen 11* to the *Fallen 9*. In this brief the Appellants will reference the *Fallen 11 and Fallen 18* but in truth it could turn out to be the *Fallen 9* and the *Fallen 20*. If in fact Alpha paid 2 of the Fallen 11 restitution then it would defeat all Alpha's arguments raised herein. However, plaintiffs would need discovery to uncover this fact.

to pay the restitution to nine of the families. Alpha's faulty proclamation is based upon a theory that wrongful death settlements with Massey, which were made prior to the existence of the NPA, somehow extinguish Alpha's duty to pay restitution to the families or estate beneficiaries of these nine miners.  Alpha contends that the NPA required it to pay $1,500,000.00 in restitution to wrongful death beneficiaries and not "families" as set forth in the NPA.  However, this position is contrary to the plain language of the NPA and is absolutely inconsistent with the actual payment of restitution made by Alpha to the other fallen miners.

Furthermore, once the NPA was signed, Alpha paid or made restitution monies available to the *estate beneficiaries* of the *Fallen 18* **versus** the *wrongful death beneficiaries* of the *Fallen 18*.  Finally, the restitution paid to the estate beneficiaries of the *Fallen 18* was done so without any credit for monies paid or to be paid to wrongful death beneficiaries of the *Fallen 18* (JA 21, 53).

Importantly, estate beneficiaries and wrongful death beneficiaries **are not, by definition or reality, the same** legal entities or "class" of persons under West Virginia law.  A payment of restitution to estate beneficiaries is not, by definition, a payment to wrongful death beneficiaries.  Moreover, wrongful death payment to Wrongful Death Beneficiaries does not equate to restitution payment to Estate Beneficiaries. The terms Estate Beneficiaries and Wrongful Death Beneficiaries cannot be used interchangeably.

4

The Appellants respectfully seek an order from this Honorable Court directing the Honorable Irene Berger of the Southern District of West Virginia to protect these appellant's rights under the Non-Prosecution Agreement (NPA) as required by **18 U.S.C. § 3771** Crime Victims' Rights Act.  Finally, the Appellants request this Court <u>reverse</u> the district court's order granting dismissal of their contract action and remand this case for a full development of the record so that it can be determined if the Appellants have been treated fairly and paid the restitution as set forth in the NPA (JA 78).

<b><u>Statement of the Facts</u></b>

The Appellants (Estate Beneficiaries) are victims of federal crimes committed by the agents of Massey and its subsidiaries (JA 52).  Their loved ones died in one of the worst mining tragedies in the history of the United States on April 5, 2010.  On June 1, 2011, Alpha purchased the assets of Massey and its subsidiaries. At some point after Alpha completed its purchase, it entered into discussions with the United States Attorney's Office for the Southern District of West Virginia to consummate an Agreement that would forever absolve Alpha from any future criminal responsibility as it related to the deaths and injuries at Upper Big Branch mine.  The "agreement" is known as the *Non-Prosecution Agreement* (JA 78).

5

The opening provision of the NPA which Alpha voluntarily entered into states that the U.S. Attorney's Office ("Office") was involved in an "ongoing criminal investigation" arising out of the "explosion" at "Upper Big Branch" (JA 78).

> This Agreement arises from the ongoing **criminal investigation** conducted by the Office of the **explosion** at Performance Coal Company's **Upper Big Branch Mine** ("UBB") on April 5, 2010 and the conduct of employees of Performance Coal Company and its parent, Massey, and its affiliates regarding violations of the Mine Act, misleading statements regarding health and safety issues, conduct that impeded the work of the United States Department of Labor ("DOL"), including the Mine Safety and Health Administration ("MSHA"), and related issues (JA 78).

The NPA also states that the Government agrees not to criminally prosecute Massey, any predecessor or successor of Massey for any criminal acts committed by its agents.

> 11. In consideration for Alpha's and Massey's entering into this Agreement and their commitment to perform the duties and obligations set forth herein, the Government agrees not to **criminally prosecute** or bring any civil action against Massey, any predecessor or successor of Massey, its current parent, or any of its current or previous direct or indirect affiliates, related to: (a) any conduct attributable to Massey or its affiliates set forth in the Superseding Indictment filed in *United States v. Hughie Elbert Stover,* 5:11 Cr. 00038 (S.D. W. Va.), and in *United States v. Thomas Harrah*, 5:11 Cr. 00082 (S.D. W. Va.); (JA 80).

One of the major elements of the NPA was the voluntary restitution to be paid to families of the victims. In the first sentence of **Paragraph 8** it states:

> As **restitution for the victims** injured in the explosion Alpha agrees to pay, or to cause Massey or its affiliates to pay, at **least $1,500,000.00 to each of the families of the fallen miners.** (JA 79))

6

By using the words "victims" and "families" the only class of persons entitled to receive payment is the *Estate Beneficiaries* of the *29 Fallen Miners*. Clearly, any restitution payment is to be made to the Estate Beneficiaries. It is undisputed that Alpha agreed to pay $1,500,000.00 to each of the families. The legal query is "*how to define family*" as set forth in the agreement.   The Appellants contend that the word "family" means Estate Beneficiaries.

The Appellants do not dispute that Massey (not Alpha) settled wrongful death claims with the wrongful death beneficiaries of the fallen miner's estates prior to the execution of the NPA. However, a payment to wrongful death beneficiaries, a separate entity or class of persons, does not equal a payment to the "family" or estate beneficiaries. Since the two classes of 'beneficiaries' are separate and distinct legal entities, the Appellees cannot possibly use monies paid to wrongful death beneficiaries to satisfy a legal obligation to pay restitution due to estate beneficiaries. So, while Massey did pay a $3,000,000.00 wrongful death settlement to the wrongful death beneficiaries of the *Fallen 9*, neither Massey nor Alpha ever paid $1,500,000.00 in restitution to the families of the *Fallen 9*.

In the district court Reply Brief, Alpha admitted that when the NPA was executed it intended "families" to be and equate to estates. This interpretation is consistent with Alpha's actions after signing the NPA.  Specifically, when the NPA

was executed 18 wrongful death claims were pending.  If a wrongful death case was still pending then Alpha was permitted, under the NPA, to make two separate restitution payments to the families of the *Fallen 18*.

> (b)(i) $500,000.00 to be paid within 15 days of the execution of this Agreement, and (ii) $1,000,000.00 which will be payable at the time of the resolution of pending civil claims through settlement, judgment, or otherwise, and as part of such civil resolution to the extent the civil resolution results in a monetary recovery[3] (JA 79).

The unknown is "*did Alpha and the U.S. Attorney's office define family in some way other than what is expressly set forth in the NPA*?"  In other words, was the $500,000.00 restitution to be paid to the estate beneficiaries, i.e. family of the *Fallen 18* or was the $500,000.00 restitution to be paid to the wrongful death beneficiaries, who can be non-family members of the *Fallen 18*?  It is known that the restitution payments to the *Fallen 18* were actually paid directly to the estate beneficiaries ***only*** – and not wrongful death beneficiaries.  The payments went directly to the "families of the fallen miners" without court approval and without consideration for the existing wrongful death beneficiaries.

It is undisputed that within 15 days of execution the NPA, Alpha paid or offered to pay $500,000.00 to the Estate Beneficiaries of the *Fallen*

---

[3] The estates of the *Fallen 18* were to be paid and were paid immediate restitution in the amount of $500,000.00. The wrongful death beneficiaries of the *Fallen 18*, on the other hand, continued pursuing their wrongful death claims even after the final restitution payment was paid to the estate beneficiaries.

18[4]. The money was paid to those who could receive it under **West Virginia Code § 42-1 <u>not</u> West Virginia Code § 55-7-6** (JA 20, 51A). The U.S. Attorney's Office vocalized no objection to the restitution payments being made to the estate beneficiaries. The $500,000.00 restitution was never made or offered to any of the wrongful death beneficiaries of the *Fallen 18*. If the $500,000.00 was meant to be paid as wrongful death money then by statute the United States Government and Alpha would, at a minimum, be required to do the following:

1.    Obtain a Circuit Court hearing date for approval of wrongful death settlement and distribution;

2.    Have guardians appointed for any minors that may be wrongful death distributees;

3.    Notify all of the wrongful death distributees of the *18 Fallen* miners of the wrongful death distribution hearing date so they could file or make appropriate claims;

4.    File a petition with a West Virginia Circuit Court for all 18 Fallen miner families seeking approved of the settlement and distribution;

5.    Obtain an Order signed by the West Virginia Circuit Court approving the acceptance of the $500,000.00 and designating the distribution;

6.    Then, on the day of the distribution hearing write multiple checks to the multiple wrongful death beneficiaries based upon the decision by the Court as to how the money was to be distributed.

---

[4] The District Court Memorandum discounted the unopposed Affidavit attached to the complaint verifying that $500,000.00 was paid by Alpha directly to estate beneficiaries. The district court in giving the NPA its "clear meaning" stated that Alpha's actual actions in complying with the NPA had no bearing on its decision.

These are mandatory steps required by the West Virginia wrongful death statute. **West Virginia Code § 55-7-6** Statutory compliance is not discretionary and is totally absent with regard to the $500,000.00 restitution payments made by Alpha.[5]

Furthermore, under the CVRA and well established West Virginia contract law, the estate beneficiaries of the *Fallen 9* **must be treated the same** as the estate beneficiaries of the *Fallen 18*. The agreement unequivocally requires each family receive $1,500,000.00 in restitution. As it relates to the *Fallen 18*, the Estate Beneficiaries of those miners were paid restitution. Moreover, separate from and in addition to the December, 2011 restitution payments made to the estate beneficiaries, the wrongful death beneficiaries of the *Fallen 18* settled their wrongful death claims on or about January 6, 2012. Upon information and belief, the two seriously injured miners identified in the NPA also received $1,500,000.00 in restitution. This information, however, is presently under seal and is not expressly known to counsel for these parties.

## SUMMARY OF THE ARGUMENT

It is clear that **18 U.S.C. § 3771** provides the district court authority to review the Non-Prosecution Agreement to assure compliance, including but not limited to

---

[5] Counsel for the Appellants also represents wrongful death beneficiaries of the *Fallen 18*. He can confidently state that none of the above was done. Instead, Appellees made immediate and direct payments to estate beneficiaries – all without Court approval or without compliance with the requisites set forth in **West Virginia Code 55-7-6**.

providing the Appellants with a right to confer, fair treatment, and accurate and timely notice of court proceedings. Even outside of the NPA, the district court has the authority to review instances where some estates were paid $500,000.00 by Alpha while other estates received no payment.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

a.    **Estate Beneficiaries**

When a person dies in West Virginia, absent a Will[6] to the contrary, the estate beneficiaries are the immediate family of the deceased.  The word 'beneficiaries' is defined by **West Virginia Code 42-1.**  In most cases, the beneficiaries are household family members, not just a blood relative[7]. These family members are represented

---

[6] All Appellants' decedents died without a Will.

[7] If a man dies leaving wife/children they are by definition the estate beneficiaries. If the man dies without wife or child then the estate beneficiary is his grandchildren and if the man dies with no wife, nor child, nor grandchild then the estate beneficiaries are the man's parents. **West Virginia Code § 42-1-3a.** On the other hand under the Wrongful Death Statute **West Virginia Code §  55-7-6** the list is expanded to include stepchildren, brothers, sisters, parents (even if the deceased has a spouse and children) and any persons who were financially dependent upon the decedent at the time of his death.

by a legally appointed Administrator who acts on behalf of the beneficiaries. All of these Appellants are Estate Beneficiaries, i.e. spouses, children or parents.

When money is paid to the Estate Administrator for the benefit of the Estate, it is divided among the Estate Beneficiaries under the statutory formulas set forth in **West Virginia Code § 42-1**. Examples would be payment for property damage of the decedent, donations to the Estate or **restitution**.

Estate Beneficiaries are recognized as "victims" under the **Criminal Victims' Rights Act** (hereinafter "CVRA") **18 U.S.C. § 3771**. Under (e) *Definitions* "the term 'crime victim' means a person directly and proximately harmed as a result of the commission of a federal offense … In the case of a crime victim <u>who is deceased</u> the … <u>representatives of the</u> **crime victim's estate** … may assume the crime victim's rights under this chapter …" (**emphasis added**).

Moreover, **18 U.S.C. § 3663**(a)(1)(A) states that "the Court, when sentencing a defendant … may order … that the defendant make restitution to any victim of such offense, **or if the victim is deceased** to **the victim's estate**." Clearly and expressly, if the actual victim is deceased the "victim" becomes the victim's estate. There is no doubt that Estate Beneficiaries are the 'family' of a decedent and the 'victim' under federal law. **It is critical to note that Alpha agrees with the Appellant's position**. In its Brief filed with the district court, Alpha admitted that

12

the "families" as used in the NPA referred to "Estate Beneficiaries"[8]. Alpha concedes only estates can receive and disperse assets of the decedent[9].

### b.    Wrongful Death Beneficiaries

The West Virginia Wrongful Death Statute establishes a specific class of individuals who have the right to recover for the wrongful death of an individual. Wrongful death litigation is brought on behalf of the class by the Administrator of the Estate. This is a <u>separate class of persons</u> and not Estate Beneficiaries. The persons who qualify are well-defined as wrongful death beneficiaries in **West Virginia Code § 55-7-6** and *Murphy v. Eastern American Energy Corp.*, 224 W. Va. 95, 680 S.E.2d 110 (2009). Any money received in a wrongful death action <u>does not pass through the estate</u> but instead goes to the wrongful death beneficiaries <u>after the distribution is approved</u> by the Court where the cause of action arose. Distribution of the proceeds of the wrongful death recovery is achieved through agreement between the wrongful death beneficiaries or by order of the Court. **West Virginia Code § 55-7-6**.

---

[8] There is no doubt what Alpha and the Government intended in Paragraph 8(a) and Appendix C of the NPA -- each describe the minimum payments already made or committed to be paid in the Appendix C list of eleven **estates**—the **only legally** recognized entity that may receive and dispense the assets of the deceased. See, Defendant's Reply Brief at page 4, ECF Document #16

[9] As it relates to wrongful death beneficiaries, any monies paid do not pass through the estate but instead go directly to the wrongful death beneficiaries subject to court approval and order.

13

Critical to understanding the difference between a wrongful death beneficiary and an estate beneficiary is understanding that a wrongful death beneficiary **is not necessarily** a family member or a blood relative. In fact, any person who shows financial dependence upon the decedent can make a claim, i.e. such as a live-in girlfriend. All distributions of wrongful death monies must be approved by the Court in a wrongful death proceeding which involves only wrongful death beneficiaries. It is critical to note that wrongful death beneficiaries can only receive money from the resolution of a wrongful death case. Wrongful death beneficiaries cannot claim other types of damages outside of the wrongful death statute. For example, a "financially dependent live-in-girlfriend" is not entitled to make a claim for the decedent's motor vehicle or the furniture in the decedent's home.

    **c.    Distribution Differences between Monies Paid to Estate Beneficiaries and Monies Paid to Wrongful Death Beneficiaries**

When a wrongful death case is settled in West Virginia the wrongful death statute requires the Circuit Court to conduct a hearing and approve the settlement and distribution of the settlement monies among all of the wrongful death beneficiaries. For example, if a deceased miner was survived by 2 children, 4 siblings, a parent and a financially dependent girlfriend, then the class of wrongful beneficiaries would consist of: 2 children, 4 siblings, 1 parent and a girlfriend. If the wrongful death case was settled for $3,000,000.00, and then approved by the Court,

14

the proceeds would be distributed among those 8 individuals subject to Court approval.

If, on the other hand the $3,000,000.00 was "non-wrongful death" money or restitution, that money **_would pass solely_** to estate beneficiaries. In the example above, if a Fallen Miner was survived by 2 children, 4 siblings, a parent and a financially dependent girlfriend, then any restitution money would to be divided equally between those 2 children and only those 2 children. Approval by the Circuit Court would not be required and the siblings, parents or financially dependent girlfriend would not be entitled nor could they make a claim for "non-wrongful death" monies paid to the estate beneficiaries.

The NPA required restitution be paid to all estate beneficiaries of all the families of all the deceased miners in the amount of $1,500,000.00. These Appellants have not been paid restitution.

## **ARGUMENT**

### **Standard of Review**

This is an appeal from a motion to dismiss order. The standard of review for a motion to dismiss based upon a Federal Rule Civil Procedure 12(b)(6) order and a question of subject matter jurisdiction is **_de novo_**. The court is required to accept all allegations of the complaint as true and construe the facts in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

## <u>Discussion of the Issues</u>

**District Court's Memorandum Opinion and Order Dated May 13, 2013**

      **a.    The Court erred in not reviewing this matter under the Crime Victims' Rights Act**

The **Crime Victims' Rights Act, 18 U.S.C. § 3771(a)**[10] grants the District Court the authority and responsibility of assuring that victims of a crime have, among other rights, the following;

> (5)    The reasonable right to confer with the attorney for the Government in the case;
> (6)    The right to full and timely restitution as provided in law;
> (8)    The right to be treated with fairness and with respect for the victim's dignity and privacy

While the district court acknowledged responsibility, as it relates to **18 U.S.C. § 3771**, to grant the Appellee's motion to dismiss, the district court, at the same time, found that it had **<u>no jurisdiction</u>** because 18 U.S.C. § 3771 did not apply to the terms

---

[10] The criminal justice system has long functioned on the assumption that crime victims should behave like good Victorian children—seen but not heard. The *Crime Victims' Rights Act* sought to change this by making victims independent participants in the criminal justice process. **See**, Scott Campbell, Stephanie Roper, Wendy Preston, Louarna Gillis, and Nila Lynn *Crime Victims' Rights Act*, Pub. L. No. 108-405, §§ 101-104, 118 Stat. 2260, 2261-65 (2004) (codified at 18 U.S.C. § 3771). The CVRA guarantees crime victims eight different rights, and unlike the prior crime victims' rights statute, allows both the government and the victims to enforce them. 18 U.S.C. § 3771(a), (d)(1); *United States v. McVeigh*, 106 F.3d 325, 335 (10th Cir. 1997) (per curiam). *Kenna v. U.S. Dist. Court for C.D. Cal.*, 435 F.3d 1011 (9th Cir. 2006)

and conditions of Non-Prosecution Agreements. However, this finding is absolutely

contrary to well established law and statute which state:

> The rights described in subsection (a) shall be asserted in the
> district court in which a defendant is being prosecuted for the
> crime **or, if no prosecution is underway**, in the district court in
> the district in which the crime occurred. **18 U.S.C. § 3771(d)(3)**
> (**emphasis added**).

The statute clearly states that "the district court **shall** take up and decide any motion

asserting a victim's right forthwith" (**emphasis added**).

It is not disputed that all of the families of the decedents suffered similar

injuries and/or death as a result of the criminal acts at Upper Big Branch. Despite

these similarities, twenty of the deceased miner's wrongful death beneficiaries

settled wrongful death cases with Alpha and Massey and those same miners'

families' estate beneficiaries received $1,500,000.00 in restitution[11].  In contrast,

nine of the deceased miners (of which these Appellants are a member) wrongful

death beneficiaries settled wrongful death cases with Alpha and Massey and those

same miners families/estate beneficiaries have been inexplicitly denied restitution.

Clearly, these victims, who have become known as the Estate Beneficiaries of "*the

Fallen 9",* have the same unfettered right, pursuant to **18 U.S.C. § 3771**, to be treated

fairly. The district court is duty bound by Congress to assure fair treatment of the

---

[11] In the Memorandum Opinion and Order dated May 13, 2013 (JA 40) the district
court acknowledged that Alpha paid $500,000.00 of the restitution to Estate
Beneficiaries of the Fallen 18 but stated that this unequal treatment has no bearing.

*Fallen 9*. Presently, and without being consulted and/or receiving fair treatment, the rights of *the Fallen 9* to restitution has been compromised -- without any notice, consideration or input by those families.

It is undisputed that estate beneficiaries of the *Fallen 18* miners were paid $500,000.00 within 15 days of the Non-Prosecution Agreement being signed. This payment was simple restitution.  The payment was neither wrongful death settlement monies nor was the payment distributed pursuant the West Virginia Wrongful Death statute (JA 21, 53).

The NPA, as it relates to the *Fallen 18*, clearly states that the final payment of $1,000,000.00 will be paid outside of any settlement or verdict at the time said settlement or verdict is obtained.  Specifically, the agreement states:

> $1,000,000.00 which will be payable at the time of the resolution of pending civil claims through settlement, judgment, or otherwise, and as part of such civil resolution to the extent the civil resolution results in a monetary recovery (JA 82).

A simple reading of this language reveals that once the wrongful death beneficiaries resolve their wrongful death claim then Alpha would pay $1,000,000.00 in addition to the final judgment. The payment would be to families (Estate Beneficiaries). If the wrongful death beneficiaries of the *Fallen 18* decide not to settle their claims and a jury returned a defense verdict then the wrongful death beneficiaries would not receive any wrongful death benefits. However, the Estate

Beneficiaries of the *Fallen 18* would still receive the $1,000,000.00 in restitution for a total guaranteed restitution payment of $1,500,000.00.

Alpha's current position is that under the NPA the families (Estate Beneficiaries) of the *Fallen 9* will not receive any restitution since the wrongful death beneficiaries settled their wrongful death cases prior to the execution of NPA. However, the families (Estate Beneficiaries) of the *Fallen 18* would receive or were to receive $1,500,000.00 in restitution while the wrongful death beneficiaries of the *Fallen 18* proceeded with litigation to obtain wrongful death benefits.[12]  It is clear that the NPA makes no distinction Fallen Miner families and it is crystal clear that all families were to be treated the same (JA 78).

Apparently Alpha used smoke and mirrors and took advantage of the U.S. Attorney's Office lack of legal expertise as it relates to civil estate law. It is clear that Alpha misrepresented that it had already paid restitution to the Estate Beneficiaries of the *Fallen 9* when no such payment had been made.  Instead Massey settled the wrongful death claims of the wrongful death beneficiaries – and paid no restitution.  Incredibly, Alpha contends that the NPA simply required a minimum

---

[12] Because the *Fallen 9's* wrongful death beneficiaries received wrongful death settlement payment several months prior to the entry of the Non-Prosecution Agreement there was absolutely no reason or means to agree to an extinguishment of the families (Estate Beneficiaries) rights as crime victims without any financial consideration. Moreover, the members of the classes were not the same so action with one does not result in recovery for the other.  In fact, the agreement does not do so as it calls for $1,500,000.00 to be paid to each family.

payment of $1,500,000.00 be made to wrongful death beneficiaries of the fallen miners and not families. However, the express language of the NPA and the acts of Alpha are completely contrary to this position and the NPA is completely void of the words "wrongful death beneficiaries".

Undoubtedly, the U.S. Attorney's office intended the restitution payment to be made to all the Estate Beneficiaries since they approved the $500,000.00 being paid to the Estate Beneficiaries of the *Fallen 18* and did not require Alpha to make the payment to the wrongful death beneficiaries of the Fallen 18. The action by the U.S. Attorney's office and Alpha is precisely why it is critical under the CVRA to notify victims of matters that might affect them. Despite being victims, the Appellants were not notified of the NPA. The Appellants learned of the NPA via a public media announcement made by the United States Attorney's Office and Alpha that all of the families would be receiving $1,500,000.00 as restitution (JA 331). If these Appellants were notified, as required, they would have, at the very least, given the U.S. Attorney's Office information that would assured all of the victims receiving equal and fair treatment.

Certainly, all of these matters need to be reviewed to determine if the agreement is fair as to all victims and if it has been applied equally and fairly in its entirety to all victims. However, and contrary to well established law, the district court refused and refuses to act and dismissed the Appellants' causes of action. This

is despite the fact that the Government's investigation of Massey eventually resulted in the indictment of Massey's CEO. The district court has effectively found that the Criminal Victims' Rights Act does not apply. (JA 40) Seemingly, Alpha convinced the district court it is powerless to review the NPA. Obviously, the CVRA grants the power to the district court, but the district court must recognize the power and use it.

The express language of the CVRA states that victim representatives can file for relief even if "**no prosecution is underway**". Poignantly, in *Does v. United States*, 817 F. Supp. 2d 1337 (S.D. Fla. 2011), as in the present case, the plaintiffs complained that they were not consulted before the government entered into a Non-Prosecution Agreement. In *Does*, the plaintiff successfully argued that the CVRA's protections attach before a formal charge is filed against the criminal defendant. The *Does* plaintiffs contended that the CVRA applied and that the U.S. Attorney's Office violated their CVRA rights; namely, their rights to confer, to be treated with fairness, and to accurate and timely notice of court proceedings. The Court agreed. The *Does* Court addressed the threshold issue of whether the CVRA attaches before the government brings formal charges against the defendant and Court unequivocally held that ***it does*** because the statutory language clearly contemplates **pre-charge proceedings**. By way of example, the *Does* Court pointed out that *Subsections (a)(2) and (a)(3)* provide rights that attach to "any public court proceeding ... involving the

21

crime." Similarly, subsection (b) requires courts to insure CVRA rights in "any court proceeding involving an offense against a crime victim." Court proceedings involving the crime are not limited to post-complaint or post-indictment proceedings, but can also include initial appearances and bond hearings, both of which can take place before a formal charge. The *Does* Court found that the CVRA <u>can apply before</u> formal charges are filed and in *Does* the Court ordered complete discovery.

Another clear example of applying the CVRA <u>before formal charges</u> are filed can be found in *In re W.R. Huff Asset Management Co.,* 409 F.3d 555 (2nd Cir. 2005) where the Court found and recognized the right to bring the cause of action but eventually holding that the CVRA was not violated.

In the underlying case, it is clear that the Appellants' rights under the CVRA were violated in at least one of two ways. First, and foremost, is Alpha's admitted refusal to pay the agreed restitution as set forth in the Non-Prosecution Agreement (JA 78). Distinctly, the district court incorrectly held that since Alpha did not plead guilty to a crime, it could not oversee the timely and full payment of restitution (JA 40). The Appellants agree that if Alpha did not voluntarily agree to pay restitution the district court, absent a criminal conviction, could not order restitution. However, in this case, Alpha agreed to voluntarily pay restitution in order to avoid criminal prosecution (JA 78). The amount of restitution and the payment was expressly set

22

forth by Alpha and the U.S. Attorney's Office in a public press conference which outlined that each of the families of the fallen victims would be paid restitution of $1,500,000.00 (JA 331). However, and contrary to that NPA public broadcast, Alpha now proudly boasts it has not paid the $1,500,000.00 restitution to at least nine of those families and that it has no intentions of doing so.

It is Alpha's contention that no judicial body can insure the true victims of this tragedy receive restitution, even in light of its agreement to do so. These Appellants disagree. Although, the district court could not order restitution pre-conviction it certainly can order the payment of agreed restitution, pursuant to the CVRA. This is true even if **no prosecution is underway**. The district court positively has the power to review the terms of any non-prosecution agreement to insure that voluntary payments are full and timely as promised. The Appellants do not take issue with the amount of restitution Alpha agreed to pay to escape criminal prosecution but are extremely distressed by the fact that their CVRA rights were violated and that they were denied their right to confer, to be treated with fairness, and to receive accurate and timely notice of court proceedings.

The second way the Appellants' CVRA rights were violated is that they were not treated with fairness and with respect. The NPA was entered into under the guise that all of the families would be treated the same. It is abundantly clear, however, that under the NPA the Estate Beneficiaries of at least 18 families were paid

restitution outside the claim of their wrongful death beneficiaries (JA 21, 53). Meanwhile, the estate beneficiaries of the *Fallen 9* have not paid any restitution. Plainly, these Appellants are entitled and they seek to have the non-prosecution agreement equally and fairly applied to all victims or that the NPA be set aside. See, *Does*, *Id*.

Continuing, the district court also dismissed the Appellants' request under the CVRA even though in **Footnote 7**, the Court recognized that the Appellants have clear pre-indictment rights.

**Footnote 7** states as follows (J.A. VI at 40):

> For example, the right to be "reasonably protected from the accused" and the right to be "treated with fairness and with respect" may apply pre-indictment. *Does v. United States*, 817 F. Supp. 2d 1447 (S.D. Fla., 2011) ("The government's obligation to give victims notice of their rights under subsection (a) can apply before any charging instrument is filed, depending on which subsection (a) right is at issue and the circumstances involved.") (JA 48)

A significant area about which these Appellants sought review by the district court was based on the absence of fair treatment which was the consideration for Alpha obtaining relief under the Non-Prosecution Agreement. The restitution rights of the *Fallen 9* were extinguished without any advance notice or consultation. No explanation has been given as to why the *Fallen 18* and *Fallen 2* were provided payments of $1,500,000.00 in restitution and the *Fallen 9* received no restitution. The role of the district court under the CVRA is to make an inquiry and review the

NPA to assure that all victims are treated fairly and with respect.  It is baffling that the district court found it is required to undertake such a review but then refused to do so and instead dismissed the Appellants' cause of action.

### District Court's Memorandum Opinion and Order Dated April 6, 2015

#### a.    Standing and Prosecutorial Discretion and the NPA

The district court acknowledged that the Appellants are making a claim as estate beneficiaries and are a distinct legal entity totally different than wrongful death beneficiaries (JA 492). However, while professing this point, the district court's rulings as it relates to the NPA continues to treat the plaintiffs as if they are making a claim as wrongful death beneficiaries. As a result, most of the district court's ruling simply does not apply to the Appellants' claims.

Clearly, if the district court believes that the plain language of the NPA related to payments to wrongful death beneficiaries, then the district court should have simply written a short opinion dismissing the plaintiffs' complaint because they are not the legal entity or class of persons referenced in the NPA.  Obviously any facts regarding payment or non-payment by Alpha to wrongful death beneficiaries is irrelevant to a claim made by Estate Beneficiaries. The same would hold true as it relates to discussions regarding settlement agreements between Massey and wrongful death beneficiaries. These agreements would be irrelevant to claims made by Estate Beneficiaries. The district court did not find that the Estate Beneficiaries had no

standing on the basis that they are not named in the NPA.  Instead, the district court treats Estate Beneficiaries and Wrongful Death Beneficiaries as the same legal entity without distinction. As a result, there are ***critical errors*** in the district court memorandum opinion regarding West Virginia law.  Specifically, in ***Footnote 8*** the Court states:

> "The Court observes that the same counsel now representing the Plaintiffs represented Mr. Skeens during the referenced settlement agreements."

The district court's statement is legally incorrect.  Counsel did not represent Mr. Skeens in the wrongful death proceedings.  Counsel represented the wrongful death beneficiaries at the direction of the Administrator of the estate. In the current action, legal counsel represents the Estate Beneficiaries at the direction of the Administrator of the estate. This litigation cannot be viewed for dismissal purposes as if this is an action brought by Mr. Skeens – because it is not.

Furthermore, the district court committed error in ***Footnote 6***.  In this footnote, the district court lists the class of individuals who take pursuant to **West Virginia Code § 55-7-6, i.e.** the West Virginia wrongful death statute.  The district court inexplicably makes the following comment: "*It would be a rare wrongful death case that did not include distributions to estate beneficiaries*".

In fact, due to the number of individuals recognized by **West Virginia Code § 55-7-6** it is "rare" that the wrongful death settlements would be paid to Estate Beneficiaries. Instead, monies are spread thin among multiple individuals who

26

would not take or be otherwise entitled because they are not estate beneficiaries. A person who was an estate beneficiary as well as a wrongful death beneficiary may only receive a portion of the wrongful death settlement because the class may be and is historically much larger. As a result, an Estate Beneficiary is rarely made whole. One potential means of addressing this problem would be for Alpha to pay restitution ***only to the Estate Beneficiaries***. This is precisely what the NPA was intended to accomplish as it relates to ***the families*** of the deceased miners – the Estate Beneficiaries.

Since the district court did not simply dismiss the plaintiffs' complaint because Estate Beneficiaries were not parties to the NPA, it must be assumed that the district court at least recognized that the plaintiffs meet the definition of "families" as set forth in the NPA. Clearly, and at a minimum, the Plaintiffs, as Estate Beneficiaries, are also third party beneficiaries to the NPA and therefore have standing to bring this cause of action.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████

In granting the motion to dismiss, the district court found the NPA to be an unambiguous contract in which it could make a legal determination without additional discovery (JA 501). However, in reaching this conclusion the district court failed to give meaning to critical terms and phases, added additional wording not found in the NPA and failed to apply well-established West Virginia law.

**b.      Who are 'victims' and 'families' as the words are used in the NPA?**

Specific and express interpretation must be given to the words "victim" and "families" as used in the NPA. In its Memorandum Opinion, the district court did not define this group as used in the NPA. However, the NPA makes it clear that "families" must be defined the same for both the *Fallen 11* and the *Fallen 18*.

The clear language of the NPA requires payment of restitution go to the victims. It also is clear that NPA 'victims' are the 'families' of the fallen miners[13]. Well established federal law recognizes that when a crime victim is deceased <u>the one and only group</u> that can take the place of the crime victim is the crime victim's <u>estate</u> **18 U.S.C. § 3663**.  The Crime Victims' Act plainly states that when restitution is paid, if a victim is deceased, the restitution is paid to the victim's estate.  **18 U.S.C. § 3663(a)(1)(A)** It is clear that wrongful death beneficiaries do not meet the definition of "family" and there is no statute that permits wrongful death beneficiaries to recover restitution. Wrongful death beneficiaries can only receive wrongful death benefits.

Just as clear, only estate beneficiaries meet the definition of 'families' as used in the NPA. In fact, the unopposed *Affidavit of Tiffany Sovine* provides proof that once the NPA was signed Alpha made the restitution payments to the Estate Beneficiaries of the *Fallen 18* and not the wrongful death beneficiaries. Based upon the district court's opinion, the payment to the Estate Beneficiaries would have been made with the approval of the United States Attorney's Office.  Although the district court found that the United States Attorney's Office had the right to interpret and

---

[13] The agreement states "as restitution for the victims injured in the UBB explosion, Alpha agrees to pay or to cause Massey or its affiliates to pay at least $1,500,000 to each of the families of the fallen miners and to two individuals affected by the UBB explosion".

enforce the NPA in one part of the Opinion. (JA 497) However, in another part of the memorandum opinion the district court found that the United States Attorney did not have that right when it came to the actual payments made. (JA 501) These two findings are conflicting.

Under **Title 18 U.S.C. § 3771**, the plaintiffs, as the crime victims' lawful representatives, have the right to bring an action to protect their rights[14]. The NPA requires at least $1,500,000.00 in restitution be paid to the victims of the Estate. Estate Beneficiaries are well defined under West Virginia law and are not legally interchangeable with wrongful death beneficiaries.

### c.     The NPA requires payment as opposed to a waiver of payment

The district court <u>found</u> that the plain language of the NPA provides that each miner's family must receive at least $1,500,000 in a "civil" settlement. The word "civil" was inserted into the NPA by the district court – although a diligent search of the NPA will not reveal the word "civil". Distinctly, payment is required and is to be the same as to the "families" of all of the fallen miners – there is no exception or waiver.

---

[14] The district court, in a prior ruling, stated that the plaintiffs do not have a right to file a cause of action under **Title 18 U.S.C. § 3771**. However, as victims they are no doubt afforded certain overall rights as set forth by Congress in the Act. One of which is to bring a cause of action to protect their rights. Wrongful death beneficiaries have no legal standing but estate beneficiaries do in fact have standing.

The NPA clearly states that the restitution <u>shall</u> be paid. The NPA does not waive the requirement to pay restitution or provide any exceptions. In West Virginia, the word "<u>*shall*</u>" in a contract is mandatory. *State ex rel. Trent v. Sims*, 77 S.E.2d 122, 138 W. Va. 244 (W. Va. 1953)

The word "families" must be interpreted consistently as it relates to the payment of restitution. On or prior to December 21, 2011, Alpha made restitution payments to the Estate Beneficiaries of the *Fallen 18*. Therefore, 'families' as defined by Alpha, was clearly understood as being the Estate Beneficiaries. These payments were made outside of any future settlement agreements with the wrongful death beneficiaries of the *Fallen 18* and Alpha agreed to make the payments to the *families* of the Fallen Miners.

The plaintiffs have repeatedly stated that "Families" equals "Estate Beneficiaries". In its Motion, Alpha admits it is required to pay Estate Beneficiaries and that the act of paying Estate Beneficiaries of the *Fallen 18* was approved by the United States Attorney's Office[15]. Moreover, the Affidavit of Tiffany Sovine provides unopposed evidence that Alpha excluded wrongful death beneficiaries

---

[15] The District Court stated that "The Government has discretion in handling criminal prosecution. The uncontested allegations are that the government within its "discretion" required Alpha to pay $500,000 to the Estate Beneficiaries of the Fallen 18 within 15 days of the NPA being signed". Despite this uncontested fact for purposes of the motion to dismiss, the district court changed the Government's intent that payments be made to Estate Beneficiaries and instead found that payments were paid to Wrongful Death Beneficiaries for the Fallen 11.

when it paid the initial restitution because the payment went to the Estate Beneficiaries of the *Fallen 18* – and not the class of wrongful death beneficiaries of which her infant sons were members.

Accordingly, the Paragraph needs to be reviewed with the phrase "Estate Beneficiaries" replacing the word "families" as follows:

> $16,500,000 was previously or anticipated to be paid as part of settlements with the *Estate Beneficiaries* of eleven of the fallen miners in the actions in Appendix C and (b) $30,000,000 will be paid to the *Estate Beneficiaries* of the fallen miners and two individuals affected by the UBB explosion in the actions in Appendix D who have not resolved their claims, consisting of payment to each of (i) $500,000 to be paid within 15 days of the execution of this Agreement, and (ii) $1,000,000 which will be payable at the time of the resolution of pending civil claims  through settlement, judgment, or otherwise, and as part of such civil resolution to the extent the civil resolution results in a monetary recovery. (NPA ¶ 8)

As it relates to the *Fallen 11*, Alpha states that for those claims in which wrongful death beneficiaries had resolved their claims, Alpha would settle the restitution owed to the Estate Beneficiaries by paying them at the same time. If they were not paid, then the payment would be made in future as an anticipated settlement with the Estate Beneficiaries (i.e. settling what they have agreed to pay in the NPA). The $16,500,000 was not paid to the wrongful death beneficiaries who had settled their disputes with Alpha. Those wrongful death beneficiaries were paid a total of $33,000,000.  If **Paragraph 8** referred to Wrongful Death Beneficiaries then it would say;

$33,000,00,000 was previously or anticipated to be paid as part of settlements with the <u>Wrongful Death Beneficiaries</u> of eleven of the fallen miners in the actions in Appendix C and <u>therefore no other payments are due the Wrongful Death Beneficiaries of the Fallen 11.</u>

The remaining part of ***Paragraph 8*** would then need to be consistent.

$30,000,000 will be paid to the <u>Wrongful Death Beneficiaries</u> of the fallen miners and two individuals affected by the UBB explosion in the actions in Appendix D who have not resolved their claims, consisting of payment to each of (i) $500,000 to be paid within 15 days of the execution of this Agreement, and (ii) $1,000,000 which will be payable at the time of the resolution of pending civil claims through settlement, judgment, or otherwise, and as part of such civil resolution to the extent the civil resolution results in a monetary recovery. (NPA ¶ 8)

The one and only question that needs to be resolved is "based upon the record what did Alpha do to fulfill its restitution obligation?" The unopposed Affidavit of Tiffany Sovine shows that within 15 days Alpha made payments to the Estate Beneficiaries of the *Fallen 18*. The district court ignored the Tiffany Sovine Affidavit and this important fact. In addition, the $500,000.00 payment has nothing to do with the settlement of a wrongful death case by the wrongful death beneficiaries of the *Fallen 18*. The NPA makes it clear that the $500,000.00 is neither an advance nor a setoff of any wrongful death settlement nor was it treated as such[16].

---

[16] In the memorandum opinion, the district court stated the following "Read in full, the pertinent portion of the NPA sets a $1,500,000 minimum civil recovery for each of the families of the UBB victims." (NPA ¶ 8) In fact, the plaintiffs' pleadings and the uncontested Sovine Affidavit completely refute this finding. The $500,000.00 paid by Alpha to the Estate Beneficiaries was outside and unrelated to any "civil" settlement. The money was not paid to the Wrongful Death Beneficiaries. Clearly, the uncontested facts are that the NPA did not call for a minimum payment on any civil litigation.

33

It is clear that the payment was made to the Estate Beneficiaries of the *Fallen 18* because that is how "families" and "victims" are defined. The NPA also makes it clear that when the wrongful death beneficiaries of the *Fallen 18* resolve their cases with Alpha then the final $1,000,000.00 would be paid to the Estate Beneficiaries of the *Fallen 18*.

The NPA does not say that only the Estate Beneficiaries of the *Fallen 18* get restitution of    $1,500,000.00 outside of any wrongful death benefits paid to the wrongful death beneficiaries of the *Fallen 18* while the Estate Beneficiaries of the *Fallen 11* get $0 in restitution.  The NPA is clear that all of the families of the fallen miners are to be treated the same. However, the district court treated the two groups differently and granted the motion to dismiss.

Absent discovery and with the overall confidentiality, the Appellants are unable to provide this Court or the district court the information given to the United States Attorney's office to persuade that Office that the *Fallen 11* and *Fallen 18* had been treated the same. It is clear that the promised $1,500,000.00 restitution payment was never made to the Estate Beneficiaries of the *Fallen 11*[17].

---

[17] Alpha has always avoided this subject in its motion to dismiss. They have yet to explain why they paid the $500,000 to the Estate Beneficiaries of the *Fallen 18* if in fact the money was to go to the wrongful death beneficiaries of the *Fallen 18*.

Obviously, this Court cannot permit "families" to be defined as wrongful death beneficiaries for the *Fallen 11* but defined as Estate Beneficiaries for the *Fallen 18*.

The NPA does not waive the requirement to make restitution to the *Fallen 11*. However, in an attempt to avoid paying restitution to the families of the *Fallen* 11, Alpha apparently represented to the U.S. Attorney's Office that Massey had already paid $1,500,000.00 to the Estate Beneficiaries of the *Fallen 11*. This tactic could be labeled as a proverbial "bait and switch".

The Fourth Circuit Court of Appeals has made it clear that "agreements to exchange cooperation for transactional immunity are governed by traditional principles of contract law." *United States v. McHan*, 101 F.3d 1027, 1034 (4th Cir. 1996) For a contract to give rise to a cause of action for a third party not in privity, the contract "must have been made for the third party's sole benefit." *E. Steel Constructors, Inc. v. City of Salem*, 549 S.E.2d 266, 278 (W. Va. 2001) (citing **W. Va. Code § 55-8-12** (2011)). "In the absence of a provision in a contract specifically stating that such contract shall inure to the benefit of a third person, there is a presumption that the contracting parties did not so intend." *Robinson v. Cabell Huntington Hosp., Inc.*, 498 S.E.2d 27, 32 (W. Va. 1997) Where plaintiff seeks recovery as third-party beneficiary under contract to which he is not party, it is necessary that plaintiff demonstrate that contracting parties intended to confer

benefit upon plaintiff by their contract. *Woodford v. Glenville State College Housing Corp.*, 159 W. Va. 442, 225 S.E.2d 671 (W. Va. 1976)

In the case at bar, it is clear that the Appellants were to receive a benefit. Both the United States Attorney's Office and Alpha issued press releases the date the agreement was signed. The United States Attorney's Office press release stated as follows:



The rule in a great majority of American jurisdictions is that a third person may enforce a promise made for his benefit even though he is a stranger both to the contract and to the consideration. In other words, it is not necessary that any consideration move from the third party; it is enough if there is a sufficient consideration between the parties who make the agreement for the benefit of the third party. This doctrine, originally an exception to the rule that no claim can be sued upon contractually unless it is a contract between the parties to the suit, has become so general and far-reaching in its consequences as to have ceased to be simply an exception, but is recognized as an affirmative rule, subject to certain limitations and exceptions.

In *Standard Oil Company v. Smith*, 116 W. Va. 16, 178 S.E. 281 (W. Va. 1935), the Court held: 'When a covenant in a bond provides security for a class, not

a party to the bond, a member of the class may sue in equity on the bond for the benefit of himself and others of the class. *Hartmann v. Windsor Hotel Co.*, 132 W. Va. 307, 52 S.E.2d 48 (1949).

In *Hartmann*, the first Syllabus point states that "A person for whom compensation for services is provided under a contract made by others, to which contract he was not a party, is a creditor beneficiary thereunder, and may, in a suit in equity, recover under the same, even though such contract was not made for his sole benefit.' Thus, the plaintiffs may maintain this suit in equity as third party beneficiaries of a contract for their benefit without regard to the recording statutes, or any other issue that is presented by this record *Shearer v. United Carbon Co.*, 143 W. Va. 482, 103 S.E.2d 883 (1958). It is not the function of a court to make, extend or limit written agreements; a court is only to interpret and enforce the agreement. *Hatfield v. Health Management Associates of West Virginia*, 223 W. Va. 259, 672 S.E.2d 395 (2008)

In reading the NPA it is clear -- Alpha agreed to pay all of the families of all the Fallen 29 miners $1,500,000.00. The NPA is written in such a way as to permit Alpha to announce it is either going to pay or has already paid $46,500,000.00 as restitution. As detailed herein, restitution is a payment made in exchange for a benefit so as not to receive unjust enrichment. It is not wrongful death money and it was never identified or defined as wrongful death money. To the contrary, Alpha

37

made payments of $500,000.00 immediately to estate beneficiaries --- not to wrongful death beneficiaries.

The straight forward consideration to be paid to the *Fallen 11* was $1,500,000.00 in exchange for Alpha and more importantly the entities that it purchased being relieved of criminal prosecution. No consideration passes if the promise is for payments already made. Alpha is not making restitution, as used in the context of the Non-Prosecution agreement, by claiming a payment made in the past by Massey eliminates Alpha's commitment to make restitution in the future.

"A past consideration is, in <u>effect</u>, <u>no consideration</u> at all; that is to say, it confers <u>no benefit</u> on the <u>promisor</u>, and involves <u>no detriment</u> to the <u>promisee</u> in respect of his <u>promise</u>. It is some <u>act</u> or <u>forbearance in time</u> past by which a <u>man</u> has benefited without <u>thereby</u> incurring any <u>legal liability</u>." William R. Anson, *Principles of the Law of Contract* 149 (Arthur L. Corbin ed., 3d Am. ed. 1919).

Past consideration or something given, done, or suffered in the past which purportedly supports a subsequent promise is no consideration. If a benefit has been conferred upon the promisor or if the promisee has suffered a detriment in the past and there is a subsequent promise to pay therefore, there is no bargain for such past value. Therefore, it cannot constitute consideration. John Edward Murray Jr., *Cases and Materials on Contracts* 427 (2d ed. 1976) (Black's Dictionary 9th Edition)

From the beginning, Alpha wanted the good publicity of their "public" NPA and the commensurate benefits. But clearly Alpha never had an intention to pay the promised restitution to the *Fallen 11* miners and have as much as admitted the same.











████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

## **CONCLUSION**

The families of the Fallen miners all suffered tragic losses at Upper Big Branch. The Government has now indicted Don Blankenship, President of Massey, for criminal acts associated with those deaths. The families are all victims of those criminal acts. In order to avoid prosecution of the assets that Alpha had purchased, it agreed to pay $1,500,000 to each of the families of the Fallen miners. Wrongful death monies go to multiple individuals outside of families (as Estate Beneficiaries are defined). Restitution would go only to the Estate Beneficiaries as compensation for their losses without those monies being distributed to individuals outside of the family unit (Wrongful Death Beneficiaries). Presently, 18 of the Fallen Miners Estate Beneficiaries have received $1,500,000 and any monies they are owed under a wrongful death settlement.  As it relates to the *Fallen 11* they have not received any restitution. The fallen miners' families as victims have received unequal treatment. The rights of the *Fallen 11* Families are the same as the *Fallen 18*. The rights of the *Fallen 11* must be reviewed pursuant to the Criminal Victims' Rights Act.  Alpha should be required to comply with its voluntary Restitution Agreement.

46

The Appellants/Plaintiffs respectfully request this Court reverse the district court's Order dismissing their claims under the 18 U.S.C. § 3771 Crime Victims' Rights Act and remand this action directing the district court to address and decide the Plaintiffs' motion asserting their victims' rights forthwith. Further, the Appellants/Plaintiffs respectfully request this Court reverse the District Court's Order dismissing the third party contractual claims seeking to enforce rights granted them under the Non-Prosecution Agreement and remand this action for full factual development and for such and other relief as this Court may deem just and proper.

## REQUEST FOR ARGUMENT

Appellants request oral argument.

Respectfully submitted

/s J. Michael Ranson

---

**J. Michael Ranson, WVSB #3017**
Ranson Law Offices, PLLC
1562 Kanawha Blvd., East
Post Office Box 3589
Charleston, West Virginia 25336
(304) 345-1990

/s G. Patrick Jacobs

---

**G. Patrick Jacobs, WVSB #1867**
JACOBS LAW OFFICE
7020 MacCorkle Avenue, SE
Charleston, WV 25304
(304) 926-6676

47

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>
### Certificate of Compliance with Type-Volume Limitation,
### Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

      this brief contains <u>12,215</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated:  May 27, 2015          /s/ J. Michael Ranson
                                 J. Michael Ranson

                                 *Counsel for Appellants*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on May 27, 2015, I electronically filed the foregoing Brief of Appellants with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

<u>/s/ Melissa A. Dockery</u>
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219